**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

MARY J. MILLER (deceased) )
and DEBORAH MILLER, )
         )
    Defendant-Below/Appellant )
      and Cross-Appellee, )
         )
       v. )    C.A. N15A-03-009 AML
         )
ONIX SILVERSIDE, LLC, )
t/a CADIA REHABILITATION )
SILVERSIDE, )
         )
    Plaintiff-Below/Appellee )
      and Cross-Appellant. )

Submitted: May 10, 2016
Decided: August 26, 2016

**ORDER**
**On appeal from a decision of the**
**Court of Common Pleas: AFFIRMED, in part, and REVERSED, in part.**

This is an appeal from a post-trial decision of the Court of Common Pleas in a breach of contract case involving an agreement between a nursing home facility, a resident, and the resident's daughter. The facility filed a claim against the resident and her daughter, both of whom signed a residency agreement, for failure to make payments for nursing care and residence services. On February 27, 2015, the Court of Common Pleas entered judgment against the resident's daughter for $13,920 plus attorneys' fees and post-judgment interest. The resident's daughter has appealed the trial court's decision. The facility cross-appealed. In this

decision, I deny the appeal because the claims of error raised by the daughter lack merit. I similarly deny the facility's cross-appeal, except as to the trial court's interest award, which I reverse.

## FACTS

### A. The Resident Admission Agreement

On December 26, 2013, Mary Miller ("Mary")[1] was admitted to Onix Silverside, LLC, t/a Cadia Rehabilitation Silverside ("Cadia").[2] On December 28, 2013,[3] Mary, her daughter, Deborah Miller ("Deborah"), and Cadia signed a contract: the "Resident Admission Agreement" (the "Agreement").[4] Under the terms of this Agreement, Deborah was designated Mary's "Responsible Party." As such, the Agreement required, and Deborah agreed, to:

> exercise the Resident's rights and fulfill the Resident's obligations under this Agreement as authorized in the document(s) appointing him/her Responsible Party.

> The Resident/Responsible Party will pay promptly from the Resident's income or resources all fees and charges for which the Resident is liable under this Agreement. The undersigned agrees therefore, that she/he will take all actions necessary to insure that such funds of the

---

[1] I use Ms. Miller's first name to distinguish her from her daughter and not as a sign of disrespect.

[2] *Onix Silverside v. Miller*, C.A. No. CPU4-14-000859, at 57 (Del. Com. Pl. Jan. 28, 2015) (TRANSCRIPT) (hereinafter cited as "Tr.").

[3] Tr. 57 (Moreci). The Agreement was not signed until two days after Mary's arrival at Cadia. Generally, upon arrival at the facility, residents are given seven to ten days to sign the resident admission agreement. *Id.* at 47.

[4] *Id.* at 21. The Agreement is attached to Appellant's App. 12-20 (hereinafter cited as "Agreement").

Resident (less $44.00 per month) will be paid to the Facility, ***and that the undersigned is personally and financially liable to the Facility, for all such funds under his/her control, that s/he does not pay to the Facility pursuant to this Agreement. . . .***[5]

### B. Mary's Medicare coverage terminates.

When Mary arrived at Cadia in December, Medicare skilled care benefits covered a portion of her expenses.[6] On February 12, 2014, Cadia determined Mary's progress had plateaued, she no longer needed skilled care, and, therefore, as of February 15, 2014, she no longer was eligible to receive Medicare benefits.[7] Under the Agreement, because Medicare no longer covered Mary's expenses, Mary, or her Responsible Party, remained "responsible for charges for the entire duration of [Mary's] stay at the Facility."[8] As of February 16, 2014, Cadia began billing Mary as a "private pay" resident. The parties dispute what daily rate Mary should have been charged as a private pay resident. The Agreement states the daily rate was $270,[9] but Cadia contends the rate increased to $300 a day as of February 2014. Mary left Cadia on April 7, 2014 and did not return.[10]

---

[5] Agreement III. (A.)-(B.) (emphasis added).

[6] Tr. 128-29 (Miller). Medicare skilled care benefits covered 100% of Mary's first 20 days at Cadia and 80% of the next 31 days at Cadia, and Mary's medi-gap insurance contributed $100 a day to the latter. *Id.*

[7] Tr. 40-41, 62 (Moreci). The Notice of Medicare Non-Coverage is dated February 12, 2014 with a last coverage date of February 15, 2014. Appellant's App. 27.

[8] Agreement II. (B.) (3).

[9] *Id.* II. (A.) (1).

[10] Tr. 22 (Moreci). A resident is not charged for the day he or she leaves the facility. *Id.*

3

On or about April 7, 2014, almost two months later, the Millers appealed the decision that disqualified Mary from receiving Medicare benefits.[11] On April 9, 2014, Medicare denied the appeal and issued a W.V.M.I. Quality Insight Report (the "WVMI Report"). The WVMI Report stated Medicare was "upholding Cadia's recommendation."[12] The Millers did not appeal Medicare's decision.[13]

According to the WVMI Report, Mary's Medicare coverage ended on "12/15/2014," which is inconsistent with the February 15, 2014 date previously referenced. A Cadia employee testified that the WVMI Report was generated by Medicare, not Cadia. The Cadia employee suggested that the date in the WVMI Report was a typo and that the date should have read "2/15/2014."[14]

### C. Deborah engages in Medicaid planning for Mary.

Before she moved to Cadia, Mary lived in her home in Claymont, Delaware, while Deborah lived in Park Plaza Condominiums in Wilmington in an apartment leased under Mary's name.[15] From January to April 2014, Mary paid Deborah's living expenses, including her rent, utilities, credit card bills, car insurance, and home insurance.[16] On March 4, 2014,[17] Mary executed a Durable General Power of Attorney, giving Deborah authority over Mary's funds and assets.

---

[11] *Id.* at 64-65, 72.
[12] *Id.* at 64.
[13] *Id.* at 72-73.
[14] *Id.* at 58-59.
[15] *Id.* at 86 (Miller).
[16] *Id.* at 99-105, 109-11, 120.

On February 12, 2014, when Deborah learned Mary's Medicare benefits were going to stop, Deborah retained Karla Levinson to assist in obtaining Medicaid for Mary.[18] Deborah testified that she did not consult with anyone at Cadia about Medicaid and that the extent of any conversation with Cadia on the topic was that the Millers would need to seek Medicaid.[19] Deborah testified that she chose to use outside assistance – the Levinson Firm – "to make sure that everything was done and handled properly."[20] Ms. Levinson did not testify at trial, but various email exchanges between Ms. Levinson and Cadia's counsel were referred to during witness testimony, and the emails subsequently were introduced into evidence over Deborah's counsel's objection.[21]

Deborah paid Ms. Levinson a total of $4,750 in February and March. Deborah personally paid for Ms. Levinson's services, but later partially reimbursed herself from her mother's funds.[22] Deborah testified that Ms. Levinson's retention was for a dual purpose: (1) obtaining Medicaid coverage for Mary's stay at a nursing home and (2) protecting Mary's Claymont house and transferring it to

---

[17] *Id.* 150-51 (Miller). According to Deborah's testimony, the power of attorney was signed on two different dates: March 4, 2014 and March 18, 2014. *Id.* at 74, 151.

[18] *Id.* at 81, 119, 129-30.

[19] *Id.* at 82, 128.

[20] *Id.* at 128.

[21] *Id.* at 181-84 (Moreci). A Cadia employee was carbon copied on these emails. *Id.* at 181.

[22] *Id.* at 107, 119, 131 (Miller). Deborah only partially was reimbursed because Mary "didn't have enough to reimburse [her] fully." *Id.* at 131.

5

Deborah's name.[23] To accomplish this, Ms. Levinson helped Deborah submit an application for Medicaid benefits on Mary's behalf.[24] Deborah testified that their goal was to file the Medicaid application so its effective date would be March 1, 2014.[25] Mary's Medicaid application ultimately was submitted at the end of June 2014 and approved with an effective date of June 1, 2014.[26]

To qualify for Medicaid, an applicant must meet certain income requirements.[27] Subject to Medicaid's eligibility criteria, Medicaid may retroactively pay an applicant's expenses incurred up to three months before the application date.[28] As part of the Medicaid-planning process that Ms. Levinson recommended, Deborah had to "spend down" Mary's assets and resources to below $2,000.[29]

In March 2014, Ms. Levinson set up a Miller Trust for Mary.[30] Deborah testified that the purpose of a Miller Trust was to allow an applicant to exceed the Medicaid income limits and still be eligible for Medicaid.[31] She testified that, to her understanding, Mary's income was deposited to this trust and only could be

---

[23] *Id.* at 82-83.
[24] *Id.* at 81.
[25] *Id.* at 138.
[26] *Id.* at 84, 138.
[27] *Id.* at 84; *Id.* at 174 (Moreci).
[28] *Id.* at 174-75 (Moreci).
[29] *Id.* at 83-84 (Miller); *Id.* at 174 (Moreci).
[30] *Id.* at 152 (Miller). The Defendants' last name and the name of this type of trust is a coincidence.
[31] *Id.* at 90.

6

used for Medicaid copays and related expenses.[32] On June 26, 2014, also for Medicaid qualification purposes, Mary conveyed her Claymont house to Deborah.[33] Ms. Levinson prepared the deed.[34] Deborah essentially testified the house was a gift, since she did not pay her mother any money for it.[35] The house had no mortgage on it, was free and clear of all liens, and Deborah estimated its value at $160,000.[36] Until the home was transferred, Mary was not eligible to receive Medicaid coverage.[37]

## PROCEDURAL HISTORY

On April 9, 2014, Cadia filed an action against Mary[38] and Deborah to collect $15,247 in damages for breach of contract and fraudulent conveyance.[39] The damages were the result of the Millers' failure to pay for Mary's stay at Cadia, as required under the Agreement signed by both Mary and Deborah.

On January 28, 2015, the Court of Common Pleas held a one-day trial, during which the judge agreed to the parties' joint request that any application for

---

[32] *Id.* at 151.
[33] *Id.* at 74, 83.
[34] *Id.* at 143.
[35] *Id.* at 77-78.
[36] *Id.* at 79. The house sold on May 24, 2016. D.I. 19.
[37] Tr. 155-56 (Miller). Although the home was not transferred until the end of the month, Medicaid will cover the entire month of care, provided an applicant is qualified by month's end.
[38] Mary passed away months after the complaint was filed.
[39] This amount is less than the $22,605.19 Cadia originally sought in the complaint. Cadia reduced the bill after the complaint was filed to adjust for Mary's leaving the facility on April 6, 2014.

interest and attorneys' fees be handled "post-trial method rather than here."[40] On February 3, 2015, Cadia filed its application and affidavit for attorneys' fees and costs, seeking $15,389.86.[41] No opposition was filed.

On February 27, 2015, the Court of Common Pleas entered judgment in favor of Cadia, awarding damages in the amount of $13,920 for breach of contract plus $10,296.40 in attorneys' fees and post-judgment interest at the legal rate of 5.75%. On March 26, 2015, Deborah appealed the trial court's decision. Cadia filed a cross-appeal on April 2, 2015.

## THE PARTIES' CONTENTIONS

### A. Deborah's Appeal

Deborah argues the trial court made three erroneous evidentiary rulings.[42] First, Deborah contends the trial court "erred in considering Kara [sic] Levinson's email since she did not appear or testify and [Deborah] objected as hearsay but the Court allowed it into evidence and her email became a central part of the case."[43] During oral argument on the appeal, Deborah's counsel acknowledged that he withdrew his objection to this evidence during trial, but argued that this Court is allowed to reverse the ruling for plain error. Second, Deborah argues the trial court erred by allowing into evidence the WVMI Report along with the testimony

---

[40] Tr. 116.
[41] Appellee's Answering Br. 1.
[42] Although Deborah does not explicitly say so, I assume she contends that, had the trial court not admitted the disputed evidence, it would have reached a different conclusion as to liability.
[43] Appellant's Opening Br. 13.

8

that the 12/15/2014 date therein was a typo.[44] She argues: "The letter is the best evidence and the best evidence is that Mary Miller was no longer eligible for Medicare service, as of 1216/2014 [sic]."[45] Confusingly, after arguing the Report is the "best evidence," Deborah then argues in reply that the WVMI Report should have been excluded in its entirety.[46] Third, Deborah contends the trial court erred by allowing certain evidence that Deborah paid her bills using Mary's funds.[47] Deborah argues that bills she paid before February 2014 were irrelevant and submitted by Cadia "solely [] to present [her] in a bad light."[48]

In addition to those evidentiary issues, Deborah argues the Court of Common Pleas incorrectly found that she breached the Agreement. Essentially, Deborah argues everyone involved in her mother's care understood Mary was "Medicaid pending" during March and April and she therefore improperly was billed as a "private pay" patient. This argument takes two forms. First, Deborah argues that Mary should have been classified as "Medicaid pending" and charged only the monthly Medicaid patient pay rate, which, according to Deborah, was Mary's monthly income of $1,800 less $44.[49] Alternatively, Deborah argues: "Since Mary Miller was accepted for Medicaid [in June 2014] and Medicaid goes

---

[44] Tr. 58-59 (Moreci).
[45] Appellant's Opening Br. 14.
[46] Appellant's Reply Br. & Answering Br. Cross Appeal 1-2. During trial, Deborah's counsel objected to the Report on the basis of hearsay. His objection was overruled. Tr. 38-39.
[47] Appellant's Opening Br. 14.
[48] *Id.*
[49] *Id.* at 6.

9

back for three months from the application, [Cadia] should be forced to submit a bill to Medicaid, which was never considered by the Lower Court, even though it was addressed at trial."[50]

Lastly, Deborah appeals the trial court's award of $10,296.40 in attorneys' fees and costs. Deborah argues the trial court neither sufficiently stated its reasons justifying the award nor considered Deborah's ability to pay.

Cadia responds that after "considerable legal argument over the admissibility of these e-mails," Deborah's counsel withdrew his objection to the Levinson email.[51] In response to Deborah's argument regarding the WVMI Report, Cadia contends that the 12/16/14 date is "clearly a typo . . . known to everyone under the circumstances," including Deborah.[52] Cadia argues the WVMI Report, dated April 9, 2014, affirmed Cadia's February 12, 2014 "cut letter," which further supports the testimony that the 12/16/14 date was a typographical error.[53]

Cadia also contends the trial court correctly held that the Millers breached the Agreement. Despite the fact that Mary applied, and was approved, for Medicaid in June 2014, she was "private pay" status until then, not "Medicaid pending" and therefore was obligated to pay the private pay daily rate.[54] The Millers provided no financial information to Cadia, and, while acknowledging that

---

[50] *Id.* at 12.
[51] Appellee's Answering Br. 8.
[52] *Id.* at 4.
[53] *Id.*
[54] Tr. 169 (Moreci).

10

Cadia can provide assistance in applying for Medicaid, Cadia argues it is not contractually bound to apply for Medicaid on residents' behalf.[55] Cadia acknowledges that "Medicaid can go back in time up to three months, if during that three-month period, the person is otherwise qualified for Medicaid."[56] Cadia points out, however, that up until June 26, 2014, Mary was not qualified for Medicaid because her ownership of her home left her "over resourced."[57]

Cadia also argues that Deborah waived her objection to the award of attorneys' fees and costs by failing to file a timely response to Cadia's fee affidavit and that the trial court properly exercised its discretion in granting such fees and costs.[58]

## B. Cadia's Cross-Appeal

Cadia has cross-appealed the trial court's decision, arguing the court erred by: (1) calculating damages based on the daily rate of $270, (2) failing to award pre-judgment interest, and (3) awarding post-judgment interest at the legal rate rather than the contractual rate. Cadia contends Deborah's contractual obligation is $15,247[59] (50 days[60] x $300 = $15,000 plus $247 of incidentals), based on a

---

[55] Appellee's Answering Br. 7.

[56] *Id.* at 6.

[57] *Id.* at 6-7.

[58] *Id.* at 17. Appellee originally asserted that all $15,389.86 in attorneys' fees should have been awarded. *Id.* This argument was abandoned at oral argument.

[59] Appellee's Answering Br. 16 states Cadia is seeking the "full requested amount of $15,389.86." This figure is a typo. Cadia confused the originally requested attorneys' fees amount ($15,389.86) and the balance due ($15,247).

11

daily rate of $300. According to Cadia, the daily rate increased from $270 to $300 in March 2014, effective February 2014, and neither Deborah nor Mary, nor any other representative of Mary, objected to this increase.[61] Cadia contends it also is entitled to pre-judgment interest as a matter of right under Delaware law and that it is entitled to post-judgment interest at the contractual rate, not the legal rate. Cadia argues that, because the Agreement specified a rate of 1.5% per month, the applicable interest rate is 18% per year (12 x 1.5%).

Deborah responds that the trial court properly awarded damages using the daily rate of $270 because Cadia failed to submit evidence that Mary or Deborah received notice of the rate increase.[62] As to interest, Deborah argues that because "the legislature intended for Section 2301 (A) to cap post-judgment interest rates on personal loans to the lesser of the legal rate under Section 2301 (A) or the contractual rate" and "this case is more akin to a personal loan rather than a business matter," the trial court correctly applied the legal rate.[63] Deborah does not dispute Cadia's right to pre-judgment interest.

---

[60] Mary was a private pay resident for 50 days: 13 days in February, 31 days in March, and six days in April. Tr. 21 (Moreci).
[61] *Id.* at 66.
[62] Appellant's Reply Br. & Answering Br. Cross Appeal 5-6.
[63] *Id.* at 5.

## STANDARD OF REVIEW

When considering an appeal from the Court of Common Pleas, this Court sits as an intermediate appellate court.[64] As such, the Court's function is similar to that of the Delaware Supreme Court.[65] As to factual findings, this Court's role is to review the challenged factual findings of the lower court to determine if they sufficiently are supported by the record and are the product of an orderly and logical deductive process.[66] If substantial evidence supporting the factual findings exists, this Court must accept the lower court's ruling and may not make its own factual findings, weigh evidence, or make credibility determinations.[67] As to questions of law, this Court reviews such rulings *de novo*.[68] Finally, this Court reviews the trial court's evidentiary rulings under an abuse of discretion standard.[69] "An abuse of discretion occurs when 'a court has . . . exceeded the bounds of reason in view of the circumstances,' [or] . . . so ignored recognized rules of law or practice . . . to produce injustice."[70] On all such questions, this Court reviews the appeal on the record and does not conduct a new trial.[71]

---

[64] *State v. Richards*, 1998 WL 732960, at *1 (Del. Super. May 28, 1998).
[65] *Baker v. Connell*, 488 A.2d 1303, 1308 (Del. 1985).
[66] *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).
[67] *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66 (Del. 1965).
[68] *Downs v. State*, 570 A.2d 1142, 1144 (Del. 1990).
[69] *City of Wilm. v. Flamer*, 2013 WL 4829585, at *4 (Del. Super. May 22, 2013).
[70] *Culp v. State*, 766 A.2d 489, 489 (Del. 2001).
[71] 10 *Del. C.* § 1326; Super. Ct. Civ. R. 72(g).

## ANALYSIS

### A. Evidentiary Rulings

I find no abuse of discretion or plain error in the trial court's evidentiary rulings. "[T]o find reversible error in an evidentiary ruling, [the Court] must find not only error in the ruling, but that a "substantial right of the party is affected."[72] If the reviewing court determines that the lower court abused its discretion, the reviewing court then must consider whether the decision resulted in significant prejudice.[73] The Court only should reverse a lower court's evidentiary decision where there was a clear abuse of discretion.[74] Here, Deborah's counsel eventually withdrew his objection to the Levinson email's admission. After Deborah's counsel cross-examined a witness about several Levinson emails, the trial court specifically asked him whether he was objecting to their admission, and he said "No."[75] Without an objection, the issue is not preserved for appellate review.[76] The Court "will not retroactively cure any perceived mistake created by trial

---

[72] *Mercedes-Benz of N. Am. Inc. v. Norman Gershman's Things to Wear, Inc.*, 596 A.2d 1358, 1365 (Del. 1991).

[73] *Harper v. State*, 970 A.2d 199, 201 (Del. 2009).

[74] *Culp v. State*, 766 A.2d 489, 489 (Del. 2001).

[75] Tr. 184-85. Deborah's counsel's earlier objection was sustained. *Id.* at 37. He then elicited questions concerning the Levinson emails, after which Cadia's counsel moved to have the emails admitted into evidence. *Id.* at 170-72. Additionally, Deborah's counsel later made no objection to another Levinson email being admitted into evidence. *Id.* at 189.

[76] *Weber v. State*, 457 A.2d 674, 684 (Del. 1983) ("[I]t is well settled that the failure to object to the admission of evidence or to timely move to suppress evidence constitutes waiver of the issue for purposes of appellate review.").

14

counsel's failure to object at trial."[77] Furthermore, the trial court did not rely on the Levinson email in its decision, much less make it a "central part" of the case. There is no mention of a Levinson email in the entire, 14-page decision. Therefore, the Court of Common Pleas did not commit legal error or abuse its discretion with respect to the Levinson email, and no prejudice resulted from the ruling.

Deborah argues, only in her opening brief, that the trial court erred by allowing testimony regarding possible typos in the WVMI Report. Deborah asserts that the WVMI Report is the best evidence that Mary was eligible to receive Medicare until December 2014, and the trial court therefore should have barred the Cadia employee's testimony in response to opposing counsel's questions. Deborah ignores the fact that her counsel elicited the same responses from the witness, and the trial court only allowed Cadia's counsel to "clarify it on redirect," over Deborah's objection, because Deborah "raised it on cross."[78]

Deborah's argument then shifts in reply and she confusingly argues that the Report she previously argued was the "best evidence" of Mary's Medicare cut date should have been ruled inadmissible because of the testimony regarding typos in the Report, that is, the testimony Deborah previously argued should not have been

---

[77] *Cohen-Thomas v. Lewullis*, 2016 WL 721009, at *4 (Del. Super. Jan. 29, 2016) (citing *Hamilton v. Wrang*, 221 A.2d 605, 606 (Del. 1966) (Counsel is required to "state his objection to anything taking place during the trial, and his failure to do so prevents him from urging the point on appeal.")).
[78] Tr. 59, 62 (Moreci).

15

admitted.[79] The only one of these arguments arguably preserved on appeal is the admission of testimony elicited by Cadia's counsel about the typo in the letter.[80] To the extent Deborah argues that the admission of this testimony violated the best evidence rule, she misunderstands that rule, which provides that "in proving the terms of a writing, where such terms are material, the original document must be produced."[81] The dispute Deborah raises is not as to the "terms of the writing," but rather the date Mary's Medicare skilled care coverage ended, which all parties agree, including Deborah, was February 15, 2014. Nothing about the best evidence rule precludes admission of testimony that a writing may contain typographical errors. Similarly, the testimony elicited by Cadia's counsel properly was admitted because it was the same testimony elicited by Deborah's counsel on cross-examination.

## B. Admission of Deborah's bills paid by Mary

Finally, Deborah contends the trial court erred by allowing the admission of Deborah's bills dated before February 2014 that were paid using Mary's funds.[82] Upon Deborah's objection, the court admitted the bills for a limited purpose, ruling they were "relevant for the period for which the bill was incurred or any ancillary

---

[79] Appellant's Reply Br. & Answering Br. Cross Appeal 2.

[80] Tr. 61-62 (Moreci). Deborah did not argue in her opening brief that the WVMI Report should be inadmissible and therefore that argument is waived.

[81] *Day v. State*, 297 A.2d 50, 51 (Del. 1972) (citing *McCormick on Evidence*, § 196; 4 *Wigmore on Evidence*, § 1174 (3d ed.)).

[82] Tr. 95-98, 101-03 (Miller).

time thereto."[83] Pursuant to the Agreement, Deborah agreed to "take all actions necessary to insure that such funds of the Resident (less $44.00 per month) will be paid to [Cadia] and that [Deborah] is personally and financially liable to [Cadia], for all such funds under []her control[] that she does not pay to [Cadia] pursuant to this Agreement."[84] Accordingly, I find the trial court was within its discretion in admitting into evidence such bills paid using Mary's funds pursuant to the stated limitations. Even if the bills improperly were admitted, that error was harmless under Superior Court Civil Rule 61.[85] The Court finds that Deborah suffered no prejudice because the bills supported the fraudulent conveyance claim and, as discussed below, Deborah independently was liable for breach of the Agreement.

## C. The trial court correctly concluded Mary and Deborah breached the Agreement.

The trial court's decision that Mary and Deborah breached the Agreement with Cadia sufficiently is supported by the record and is the product of an orderly and logical deductive process. The trial court determined that Mary contractually was obligated to pay the private pay rate from February 15, 2014 until April 6, 2014 and that Deborah was liable for Mary's financial obligations to

---

[83] Tr. 101, 103 ("Well, I agree with you, you cannot deplete the funds, incur a bill and deplete the funds. I think you're right. But it has to bear some relationship to the time and the bill which was incurred and it's admitted for that limited purpose subject to further review.").
[84] Agreement III. (B.).
[85] Super. Ct. Civ. R. 61: "The Court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

the extent of Mary's funds under Deborah's control.[86] The trial court rejected Deborah's argument that Cadia's failure to provide adequate care excused payment because Deborah did not "provide any evidence establishing the standard of care required."[87] Deborah's adequate care argument is not raised on appeal. Instead, Deborah argues that Cadia should have classified Mary as "Medicaid pending," and (1) Mary only should have been billed her monthly income less $44, or (2) because Medicaid covers the three months before that in which coverage was granted, Medicaid should cover the balance incurred in March and April, and Cadia should be required to submit its bills to Medicaid.

Deborah concedes that Mary was private pay for the month of February.[88] She contends, however, that Medicaid was going to cover her mother's stay at Cadia as of March 1, 2014.[89] Even if Mary was classified as "Medicaid pending" as of March 1st – the evidence says otherwise[90] – while a resident is "Medicaid pending," the resident is responsible to pay the private pay rate.[91] Deborah incorrectly maintains that "Medicaid for Mary Miller was approved in June 2014

---

[86] *Onix Silverside v. Miller*, C.A. No. CPU4-14-000859, at 9 (Del. Com. Pl. Feb. 27, 2015) (hereinafter cited as "CCP Decision") (citing Agreement II. (B.) (3), III. (B.)).
[87] CCP Decision at 10.
[88] Tr. 192 (Miller).
[89] *Id.*
[90] Based on the record, Cadia's understanding was that once Mary was cut from Medicare, she was going to be private pay "with the family's intentions of eventually filing for Medicaid." *Id.* at 53 (Moreci).
[91] Agreement II. (C.) (3): "The Resident understands that until the application for Medicaid is approved, the Resident will receive a bill for the total amount, and it is the Resident's responsibility to pay the billed amount until approved. If approval is not granted, the Resident is responsible for payment of the entire bill."

and [therefore] Medicaid would go back for three months and cover those expenses, includ[ing] March, April and May."[92] Depending on when and how the resident is determined Medicaid eligible, Medicaid *may* cover up to three months of private pay retroactively, but not in all cases. Medicaid eligibility is based on a number of criteria, namely whether the applicant's income or resources exceed the eligibility threshold. According to the record, Mary's financial position, particularly her ownership of a house, made her ineligible for Medicaid coverage before June 1, 2014.[93] Accordingly, Mary properly was billed as a private pay resident between February 16, 2014 and April 6, 2014, and Deborah is responsible for the resulting balance.

Cadia brought a separate claim against Deborah for fraudulent conveyance. I need not reach the merits of that claim because I have determined that judgment for the balance of $13,747 properly was entered against Deborah for breach of the Agreement.

### D. Attorneys' Fees

Deborah also disputes the trial court's award of attorneys' fees and costs. In my view, the trial court's award was not an abuse of its discretion. Generally, Delaware courts follow the American Rule, whereby each party bears its own costs

---

[92] Appellant's Opening Br. 12.
[93] Tr. 155 (Miller). Mary transferred the house to Deborah June 26, 2014. *Id.* at 76. "If Medicaid deems [Mary] was only eligible in June, [Medicaid] cannot go back and pay for January, February, March, April, May." *Id.* at 174 (Moreci).

19

and attorneys' fees.[94] There are, however, long recognized exceptions, one of which is a fee-shifting clause in a contract.[95] Here, the parties entered into an Agreement whereby "the Resident agrees to pay reasonable collection costs and attorney's fees."[96] Finding a contractual basis for shifting attorneys' fees, the Court of Common Pleas acted within its discretion in awarding a portion of the fees sought by Cadia.

The court has discretion to determine what amount of fees is reasonable.[97] In this case, the trial court properly explained the standard under Rule 1.5 of the Delaware Lawyers' Rules of Professional Conduct and its reasons for awarding attorneys' fees and costs, including that the parties engaged in an unsuccessful mediation, Cadia was required to engage in motion practice, and there was a one-day trial.[98] The trial court need not address each Rule 1.5 factor individually.[99]

Deborah argues that one factor the court failed to consider in assessing reasonableness was her ability to pay. Deborah's ownership of Mary's house is a

---

[94] *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006).

[95] *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014); *Bergin v. McCloskey*, 2008 WL 4662378, at *1 (Del. Com. Pl. Oct. 22, 2008).

[96] Agreement II. (G.) (2).

[97] *Dixon v. Council of Cliff House Condo.*, 2009 WL 5455537, at *5 (Del. Com. Pl. Dec. 8, 2009).

[98] CCP Decision at 13-14.

[99] *Saunders-Gomez v. Rutledge Maint. Corp.*, 2016 WL 764123, at *1 (Del. Com. Pl. Feb. 25, 2016) ("These [Rule 1.5] factors are not exclusive, nor will each factor be relevant in assessing the reasonableness of attorney's fees.") (citing Del. Lawyers' R. Prof'l Conduct 1.5, comment [1]).

substantial asset from which the attorneys' fees can be paid.[100] Deborah has argued neither below nor here that the rate charged or amount billed was unreasonable.[101] Additionally, Deborah has failed to raise any substantive objection to the bills' amount or content. Accordingly, the Court of Common Pleas did not abuse its discretion in awarding attorneys' fees and costs in the amount of $10,296.40.

### E. Amount of Damages

This Court must determine whether the trial court abused its discretion in awarding damages at the $270 daily rate rather than the increased daily rate of $300. I cannot say that the Court of Common Pleas exceeded the bounds of reason in view of the circumstances or so ignored recognized rules of law or practice to produce injustice when it awarded damages at the $270 rate. It was Cadia's burden to demonstrate that Deborah was notified of the rate change pursuant to the Agreement, which required Cadia to provide 30 days' written notice and identify an effective date for the rate change.[102] While Cadia offered testimony that

---

[100] I assume for purposes of this argument that the trial court should have considered Deborah's ability to pay. Although I recognize courts have considered this factor in some situations, *Dixon*, 2009 WL 5455537, at *6, I am highly skeptical that this is an appropriate consideration in a breach of contract case.

[101] Even if Deborah did not have a sufficient opportunity below to respond to Cadia's fee affidavit, Deborah had a full opportunity to address the issue on appeal and failed to raise any substantive objection to the amount or content of the bills.

[102] Agreement II. (A.) (3).

21

"there's a rate increase every year, a letter goes out with the invoice,"[103] and "the letters *usually* go out at the end of February,"[104] there was no evidence that Deborah, specifically, was sent a letter or otherwise notified of the rate change within the terms of the Agreement.[105] Cadia maintains on appeal that because Deborah did not object to the rate change, Cadia is not required to prove notice. This reasoning, however, contradicts the plain reading of the Agreement, which states: "Resident understands that s/he will receive a thirty (30) day written notice about any increases in daily rate changes in billing procedures."[106] Accordingly, the trial court was within its discretion in awarding damages based on the daily rate of $270. The amount of damages, however, is revised, upon stipulation by the parties from $13,920 to $13,747 based on the daily rate of $270 ($270 x 50 = $13,500 + $247 in incidentals).

### F. Cadia is entitled to pre-judgment and post-judgment interest at the contractual rate.

"In Delaware, prejudgment interest is awarded as a matter of right."[107] Generally, interest begins to accrue from the day payment is due.[108] Therefore, the

---

[103] Tr. 51-52 (Moreci).

[104] *Id.* at 66 (emphasis added).

[105] *See id.* at 131 (Miller) (Deborah testifying she never was notified that the rate changed from $270 to $300).

[106] Agreement II. (A.) (3).

[107] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (citing *Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209 (Del. 1978)).

[108] *Metro. Mut. Fire Ins. Co. v. Carmen Hldg. Co.*, 220 A.2d 778, 782 (Del. 1966); *see also Watkins v. Beatrice Cos., Inc.*, 560 A.2d 1016, 1020 (Del. 1989).

trial court erred as a matter of law by failing to award pre-judgment interest. Similarly, the Court of Common Pleas incorrectly awarded post-judgment interest at the legal rate. Where (i) a personal loan is involved or (ii) the parties fail to provide a specific interest rate or computation method, then Delaware law provides that the legal rate of interest is applied.[109] Here, there was no personal loan involved, and the Agreement specified a "Corporate late fee policy" of 1.5% of the unpaid balance per month.[110] Accordingly, Cadia is entitled to pre-judgment and post-judgment interest at the contractual rate.

Based on the foregoing, the Court of Common Pleas' decision is **AFFIRMED** as to the damages award and **REVERSED** as to the award of interest.

**IT IS SO ORDERED.**

Abigail M. LeGrow, Judge

Original to Prothonotary
cc:    Leo John Ramunno, Esquire
       Robert K. Beste, Jr., Esquire

---

[109] *See* 6 *Del. C.* § 2301(a) ("Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due; provided, that where the time from which interest is due predates April 18, 1980, the legal rate shall remain as it was at such time."); *see also Del. Tech. & Cmty. Coll. v. Emory Hill Co.*, 116 A.3d 1243 at *2 (Del. 2015) (TABLE) ("[T]he Legislature intended for § 2301(a) to cap post-judgment interest only in cases of personal loans to the lesser of the legal rate under § 2301(a) or the contractual rate."); *CRELK Enters. v. Meris Props.*, 2016 WL 2620533 (Del. Super. Apr. 21, 2016).

[110] Agreement II. G. (1).

23